Dawn M. McCraw (AZ #035321)
PRICE LAW GROUP, APC
8245 N 85th Way
Scottsdale, AZ 85258
T: (818) 600-5585
F: (818) 600-5485
E: dawn@pricelawgroup.com
*Attorney for Plaintiff*
*Gregory Matura*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Gregory Matura,<br><br>               Plaintiff,<br>    vs.<br><br>BMO Harris Bank, N.A.; Experian Information Solutions, Inc; Equifax Information Services, LLC; and Trans Union LLC,<br><br>             Defendants. | **Case No.: 1:21-cv-2208**<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**1. FCRA, 15 U.S.C. §1681** *et seq.*<br>**2. FDCPA, 15 U.S.C. §1692** *et seq.* |

Plaintiff Gregory Matura, ("Plaintiff" or "Mr. Matura"), through his attorneys, alleges violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1681 *et seq.* against BMO Harris Bank, N.A. ("BMO"), and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.* against Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and Trans Union LLC ("Trans Union") (referenced collectively as "Defendants").

## INTRODUCTION

1. Count I of Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.* by the credit reporting agency ("CRA")

Defendants. Plaintiff contends the CRA Defendants failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports, and consequently reported inaccurate information about Plaintiff.

2. Count II of Plaintiff's Complaint is based on the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et. seq., which prohibits debt collectors from engaging in abusive, deceptive and unfair practices in connection with the collection of consumer debts.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of this action pursuant to 28 U.S.C. §1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. §1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

4. Venue in this District is proper pursuant to 28 U.S.C. §1391 because Defendants regularly transacts business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

5. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

6. Plaintiff is a natural person who resides in the city of Chicago, Cook County, Illinois.

7. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. §1681a(c).

8. Defendant BMO is a creditor engaged in the business of giving consumer loans, with its headquarters located in Chicago, Illinois. Defendant can be served with process at 111 West Monroe St., Chicago, IL 60603.

9. Defendant BMO acted as a *debt collector* as defined by 15 U.S.C § 1692(a)(6).

10. Defendant Experian is a *consumer reporting agency,* as defined in 15 U.S.C. §1681a(f). On information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing *consumer reports*, as defined in 15 U.S.C. §1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

11. Defendant Equifax is a *consumer reporting agency*, as defined in 15 U.S.C. §1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of *consumer reports,* as defined in 15 U.S.C. §1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street, NW, Atlanta, GA 30309.

12. Defendant Trans Union is a *consumer reporting agency,* as defined in 15 U.S.C. §1681a(f). Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumer for the purpose of furnishing *consumer reports*, as defined in 15 U.S.C. §1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661.

13. During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Illinois and conducted business in the State of Illinois on a routine and systematic basis.

14. Defendant CRAs regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies", as defined by 15 U.S.C. §1681a(f) of the FCRA.

15. During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

16. Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## RELEVANT FACTUAL BACKGROUND

**Plaintiff's FCRA Claims:**

17. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

18. The CRA Defendants, the three major credit reporting agencies in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports (credit reports).

19. Defendant CRAs' credit reports generally contain the following information; (i) Header/Identifying Information: this section generally includes the consumer's name. current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

20. Defendant CRAs obtain consumer information from various sources. Some consumer information is sent directly to Defendants by furnishers, and other information must be independently gathered by Defendants, or acquired from third party providers/vendors or repositories, like computerized reporting services like PACER or Lexis-Nexis.

21. The information Defendants include in a credit report contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

22. The majority of institutions that offer financial services (e.g., banks, creditors, lender) rely upon credit reports from CRAs (like Defendants) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), to interpret the information in a consumer's credit report.

23. FICO and other third-party algorithms use variables or "attributes" derived from a consumer's credit report to calculate a "credit score", which is a direct reflection of a consumer's creditworthiness.

24. FICO Scores factor the following credit report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

   a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

   b. The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than actually is which will undoubtedly impact a consumer's credit score.

25. Lenders also consider a consumer's debt-to-income ratio (DTI) based on the total amount of debt reported by Defendant in consumer credit reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

26. A consumer's income, however, is not included in their credit report; only their amount of debt is.

27. Lenders consider a consumer's DTI as an indicator of whether a creditor will approve financing and the credit terms thereof.

28. The higher the amount reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for consumer to obtain credit, and the worse the credit terms will be (e.g., higher interest, lower credit limits).

29. Defendant CRAs regularly pay for, obtain and report consumer bankruptcy information to report to consumer credit reports.

30. Upon information and belief, a consumer who has obtained a bankruptcy discharge and has a credit report that is reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting as having a zero balance.

31. Further, the FCRA requires that derogatory accounts can *only* be reported for 7 years after the "date of first delinquency" on the account; at that time, an account (tradeline) becomes "obsolete" and must be removed from a consumer's credit report.

32. Upon information and belief, a derogatory account reporting a balance owed after it should have become obsolete, damages a consumer's credit worthiness.

33. The FCRA allows the CRAs to report a bankruptcy public record for up to 10 years after the filing date.

34. Defendant CRAs are well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are

discharged; both such exceptions are rare and furthermore identified on the individual consumer's bankruptcy docket sheet.

35. Defendant CRAs are also aware that including a pre-petition account in a bankruptcy filing begins its obsolescence period and that an account discharged in a Chapter 7 should not report to a consumer's credit report for more than 7 years after the Chapter 7 filing date.

36. However, Defendant CRAs regularly report inaccurate information about consumers' debts after they receive a Discharge Order.

37. Rather than follow reasonable procedures to assure maximum possible accuracy, as they are required by the FCRA, Defendants frequently report information regarding pre-bankruptcy debts bases on incomplete or knowingly inaccurate information.

38. Defendants regularly publish consumer information that conflicts with the information provided by data furnishers, included in Defendants' credit files, contained in public records that Defendants regularly access, and/or sourced through Defendants' independent and voluntary efforts.

39. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

40. Therefore, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures, which often produce inaccurate balances, account, and payment statuses.

41. In or around August of 2006, Plaintiff obtained a first mortgage with Wells Fargo, account number 708020* ("Wells Fargo Account") for his house on Nashville Ave., Chicago, IL.

42. In or around December of 2006, Plaintiff also obtained a home equity line of credit with BMO, account 6100253299 "BMO Account") for his house on Nashville Ave., Chicago, IL.

43. Plaintiff filed for a Chapter 13 Bankruptcy on or about November 23, 2010, in the United Stated Bankruptcy Court for the Northern District of Illinois case no. 10-52395.

44. On or about April 4, 2011, Plaintiff's Chapter 13 bankruptcy was converted to a "no asset" Chapter 7 bankruptcy.

45. Plaintiff did not "reaffirm" the BMO or Wells Fargo debts.

46. Plaintiff received an Order of Discharge on or about July 5, 2011.

47. BMO and Wells Fargo received notice of Plaintiff's discharge on July 7, 2011.

48. Thereafter, Plaintiff was not personally liable for his dischargeable debts and the BMO and Wells Fargo debts had a $0 balance owed after the bankruptcy discharge.

49. On or about August 27, 2020, Plaintiff received a letter from BMO announcing a "servicing transfer," specifically that BMO had "engaged Dovenmuehle Mortgage, Inc. (DMI) . . . to service the loan in BMO's name." BMO/DMI listed the "Old Loan Number" as 6100253299 and the "New Loan Number" as 4011103761.

50. Defendant CRAs received notice of Plaintiff's bankruptcy discharge years ago through their independent daily collection of his consumer information through

vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines featured on his credit reports.

51. In fact, Defendant CRAs were reporting Plaintiff's Chapter 7 public record on his credit reports as recently as July 2020; therefore, all three CRAs knew and had a record that Plaintiff had been discharged from a Chapter 7 bankruptcy in July 2011.

52. Furthermore, in July 2020, **none** of the CRAs were reporting Plaintiff's BMO or Wells Fargo Accounts.

53. Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

54. However, in this case, Plaintiff's pre-petition debts (including the Accounts) should NOT have reported to his credit because they were all indisputably obsolete.

55. Yet, on or about November 20, 2020, Plaintiff received a letter from Synchrony Bank that "after a review of [his] account, Synchrony Bank ha[d] decided to close [his] account. One of the reasons listed was "Delinquent or derogatory status on real estate secured loan is too recent."

56. Plaintiff was really confused, because he had worked very hard on his credit since his discharge and did not believe he had any delinquent accounts reporting to his credit.

57. Plaintiff thereafter obtained his personal credit reports to see why his Synchrony card was closed.

58. Defendant Trans Union inaccurately reported Plaintiff's obsolete Wells Fargo Account with a Date Opened of "08/09/2006" as "Open" with a balance owed of "$244,226." This account was in fact discharged in 2011 and therefore had no balance.

59. Trans Union was also reporting the obsolete BMO Account (610025*) with $0 Balance and a Pay Status of "120 Days Past Due." The Date Updated was "09/30/2020" and the "Estimated month and year the item will be removed [obsolete]: 12/2023 (inaccurately implying the Date of First Delinquency was in 12/2016)".

60. Strangely, Trans Union reported another BMO account, no. 310401110 ("BMO/DMI Account"), which, confusingly, did not match the account number in BMO's August 2020 service transfer notice and listed a "Date Opened: 12/28/2006." However, this was the same BMO home equity line of credit Plaintiff originally opened for his house on Nashville Ave. and was therefore a duplicate tradeline reporting. Trans Union reported the BMO/DMI Account with a Pay Status of "120 Days Past Due" and a Balance of $50,162" owed.

61. Both accounts (and the duplicate negative tradeline) were included in Plaintiff's bankruptcy and discharged on or about July 5, 2011; therefore, the Accounts were obsolete and should not have been "reinserted" into Plaintiff's credit file 9 to 10 years later.

62. Experian was also inaccurately reporting the obsolete BMO Account with a Payment History of "180 Days Past Due" and a Status of "Transferred, closed" with the Status Updated "Sep 2020."

63. Experian was also inaccurately reporting the duplicate BMO/DMI Account as "Open" with a Payment History of "180 Days Past Due" in January 2021, a Balance of $50,162 owed, and "$19,834 past due as of Jan 2021." However, this account was also discharged by Plaintiff's 2011 bankruptcy and therefore had no balance.

64. Additionally, Experian should not have reported the BMO Account (or the duplicate BMO/DMI Account) at all because the Account was obsolete.

65. Experian was not reporting the Wells Fargo Account.

66. Equifax was also reporting the obsolete BMO Account with an Account Status of "Over 120 Days Past Due," a Payment History of "180 Days Past Due" in August 2020, and a Date of First Delinquency of "Jan 01, 2017" (the correct date is April 2011 when Plaintiff's Chapter 7 was filed).

67. Equifax was also inaccurately reporting the duplicate BMO/DMI Account as "Open" with an Account Status of "Over 120 Days Past Due," a Balance of $50,162 owed, a Debt-to-Credit-Ratio of "80%," an Amount Past Due of "$19,834," and a Date of First Delinquency of "Jan 01, 2017" (the correct date is April 2011 when Plaintiff's Chapter 7 was filed). However, this account was also discharged by Plaintiff's 2011 bankruptcy and therefore had no balance.

68. Additionally, Equifax should not have reported the BMO Account (or the duplicate BMO/DMI Account) at all because the Account was obsolete.

69. Equifax was not reporting the Wells Fargo Account.

70. Upon information and belief, Wells Fargo, BMO, and BMO/DMI furnished inaccurate information to CRA Defendants that indicated Plaintiff's debt was not discharged in bankruptcy, contradicting the information contained in the CRA

12

Defendants' own files and information they obtain from public records vendors such a Lexis-Nexis.

71. The Wells Fargo, BMO, and BMO/DMI Accounts were the only inaccurate/derogatory accounts on Plaintiff's three CRA credit reports.

72. Upon information and belief, CRA Defendants additionally and/or alternatively knew from past experiences that Wells Fargo, BMO, and BMO/DMI furnished inaccurate information regarding discharged debts, or in the alternative, have historically failed to employ reasonable procedures to ensure they properly update consumer debts after a Chapter 7 Bankruptcy is discharged.

73. Alternatively, CRA Defendants blindly relied on the information provided by Wells Fargo, BMO, and BMO/DMI even though this information conflicted with information known by Defendants.

74. CRA Defendants' blind reliance on the furnishers, Wells Fargo, BMO, and BMO/DMI, was unreasonable.

75. In any event, CRA Defendants knew or had reason to know that they reported information contradicted by Defendants' own records and knowledge of Plaintiff's Chapter 7 bankruptcy discharge.

76. CRA Defendants inaccurately reported that Plaintiff owed a balance that he did not actually owe, and also reported inaccurate account statuses and/or payment histories.

77. Defendants' reporting of the Account is patently false/incorrect and therefore inaccurate.

78. If not patently false/incorrect, Defendants' reporting of the Account is materially misleading and therefore inaccurate.

79. On or about February 26, 2021, Plaintiff mailed certified letters to the CRA Defendants to dispute the inaccurate reporting of the Wells Fargo, BMO, and BMO/DMI Accounts.

80. On or about March 18, 2021, Trans Union responded that it was deleting the Wells Fargo Account, but did not mention the BMO and BMO/DMI Accounts that were also disputed.

81. On or about March 23, 2021, Equifax responded that it was deleting the BMO Account, but did not mention the BMO/DMI Account that was also disputed.

82. On or about March 26, 2021, Experian responded that it was deleting the BMO Account, but didn't not mention the BMO/DMI Account that was also disputed.

83. On or about April 7, 2021, Plaintiff obtained his personal Trans Union, Equifax, and Experian reports and discovered that the Wells Fargo, BMO, and BMO/DMI accounts had been removed from all CRAs, but not before Plaintiff was already damaged by their inaccurate reporting.

84. As a direct result of Defendants' inaccurate reporting, Plaintiff suffered damages from the closure of his Synchrony credit card, a decreased credit score, and lower overall creditworthiness.

85. Upon information and belief, had Defendants not reinserted the obsolete Accounts, Plaintiff's credit scores would have been better.

86. After retiring from the Chicago Police, Plaintiff is now working part-time as Security for the Chamber of Commerce. He has worked very hard to rebuild and maintain his credit since his bankruptcy 10 years ago.

87. Defendant CRAs actions brought back the emotional distress and anxiety that Plaintiff felt during the bankruptcy, and the frustration of debts and inaccurate derogatory accounts getting reinserted into his credit file 10 years later.

88. Due to Defendants' conduct, Plaintiff cannot seem to get the bankruptcy behind him.

**Plaintiff's FDCPA Claims:**

89. In the notice sent to Plaintiff by BMO on August 27, 2020 about the servicing transfer from BMO to BMO/DMI, BMO stated: "OUR RECORDS SHOW THAT EITHER YOU ARE A DEBTOR IN ACTIVE BANKRUPTCY OR HAVE DISCHARGED PERSONAL LIABILITY FOR THE MORTGAGE LOAN THROUGH BANKRUPTCY. THIS LETTER IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUE A DEMAND FOR PAYMENT IN VIOLATION OF THE AUTOMATIC STAY OR THE DISCHARGE INJUNCTION OR AN ATTEMPT TO RECOVER ALL OR ANY PROTION OF THE DEBT FROM YOU PERSONALLY."

90. However, only three weeks late, on or about September 18, 2020, BMO sent Plaintiff a collection letter regarding the BMO account no. 4011103761—which again was different that the number on his credit report for BMO/DMI (which was 310401110). The letter listed the Nashville Ave. address.

91. In the letter, BMO stated: "THIS DOCUMENT IS AN ATTEMPT TO COLLECT A DEBT," and "As of the date of this letter, you owe $60,824.30;" "This debt is owed to BMO Harris Bank, N.A."

92. Plaintiff was very distressed and confused since he was under the impression that the debt had been discharged in his bankruptcy 10 years earlier and that he did not have any personal liability for the debt.

93. On or about November 21, 2020, Plaintiff sent a letter to BMO stating that he had received a collection letter but had filed bankruptcy in 2010.

94. On or about January 14, 2021, Plaintiff received a letter from BMO stating that their records reflected that this loan was a "discharged, non-reaffirmed Chapter 7 Bankruptcy debt" and that the "debt validation notice" Plaintiff received was "sent in error."

95. Plaintiff was still confused however, since he had already received conflicting communications from BMO and BMO was still reporting to his credit reports both the BMO Account and the BMO/DMI Account with a different account number and a balance of $50,162 reporting as owed.

96. BMO knew the BMO account was discharged in Chapter 7 bankruptcy in 2011, as evidenced by the discharge notice in 2011, BMO's August 2020 servicing transfer notice, and the fact BMO was not reporting to Plaintiff's credit reporting in July 2020.

97. Yet, BMO transferred "servicing" of Plaintiff's discharged debt to DMI 10 years **after** the debt was discharged, began reporting it as duplicate derogatory tradelines to Plaintiff's credit reports, and sent him a collection letter for the debt.

98. Upon information and belief, BMO does not have reasonable processes in place to prevent collection efforts (including collection letters and reporting derogatory tradelines to credit reports) upon debts which have been discharged in bankruptcy.

99. Due to BMO's conduct, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, anxiety, and increased difficulty in his personal relationships.

## COUNT I
### Experian, Equifax, Trans Union
### Violations of the FCRA, 15 U.S.C. §1681e(b)

100. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

101. More than fifty years ago, the United States Congress determined that the baking system is dependent upon fair and accurate credit reporting.

102. Congress recognized that inaccurate credit reports directly impair the efficiency of the banking system. Further, Congress noted that unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

103. Congress knew that CRAs, like Defendants play a vital role in assembling consumer information and evaluating consumer credit.

104. Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.

105. The FCRA seeks to ensure consumer reporting agencies exercise their gave responsibilities with fairness, impartially, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

106.    The FCRA requires CRAs, like Defendants to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. §1681e(b).

107.    CRA Defendants negligently and/or willfully violated 15 U.S.C. §1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of credit information pertaining to pre-bankruptcy debts after a consumer receives a Discharge Order.

108.    Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

109.    Defendants' unreasonable polices and procedures cause them to regularly report consumer information without verifying its accuracy.

110.    Defendants' unreasonable policies and procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by §1681e(b).

111.    Defendants' unreasonable procedures and/or algorithms consistently fail to prevent the reporting of obsolete accounts.

112.    Defendants' unreasonable procedures and/or algorithms consistently fail to prevent the reinsertion of inaccurate accounts.

113.    Defendants know the information they report about consumers' pre-bankruptcy debts is often inconsistent with public records and their own files.

114.    In this case, the inaccurately reported debt pertains to Accounts Defendants knew predated Plaintiff's Chapter 7 Bankruptcy, were included and discharged by

Plaintiff's bankruptcy discharge, and were obsolete since Plaintiff's bankruptcy was 10 years before the Accounts were reinserted on Plaintiff's credit reports.

115. Defendants knew or should have known they are obligated, by the FCRA, to maintain and employ reasonable procedures to assure they report maximally accurate consumer credit information.

116. Defendants knew or should have known they are obligated, by the FCRA, to prevent obsolete accounts, which were discharged in the bankruptcy which Defendants had reported for 10 years, from being reinserted.

117. Defendants knew or should have known that the effect of a Discharge Order in a no asset-Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

118. CRA obligations, including tradeline obsolescence, are established by the plain language of the FCRA, promulgated by the Federal Trade Commission, supported by well-established case law, and demonstrated in prior cases involving the Defendants.

119. Therefore, Defendants had ample notice of their obligations under the FCRA and their continued use of unreasonable procedures.

120. If Defendants contend they did not have sufficient notice, Defendants must justify their own failure to review and/or locate the substantial written materials that detail CRAs' duties and obligations under the FCRA, including where consumers file for Chapter 7 Bankruptcy.

121.   Defendants regularly conduct **voluntary** public records searches with the intention of including bankruptcy information on the credit reports they sell to other parties for a profit.

122.   The diligence Defendants' exercise in uncovering and recording consumer bankruptcy filings is not replicated on Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

123.   In this case, Defendants sought out information about Plaintiff's bankruptcy filing and discharges and maintained it in his credit file.

124.   When Defendants located and published Plaintiff's bankruptcy information, they had an obligation to ensure that pre-petition debts were reported with maximum accuracy.

125.   Unfortunately, Defendants willfully and consciously breached their duties as CRAs and deprived Plaintiff of his right to a fair and accurate credit report.

126.   Despite knowledge of their legal obligations, Defendants violated 15 U.S.C. §1681e(b) by failing to use reasonable procedures to ensure maximum possible accuracy of Plaintiff's consumer disclosure/credit report.

127.   Defendants had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information they published in his credit reports in July 2020, including his bankruptcy case number, court, date of filing and date of discharge.

128.   Defendants know that Chapter 7 pre-bankruptcy debts which have been discharged should not be reported for more than 7 years after the bankruptcy filing date.

129. Yet in this case, Defendants reported the Accounts, which predated Plaintiff's bankruptcy, with a balance owed, 10 years after his bankruptcy filing date.

130. Defendants knew or should have known the information they reported about the account was inaccurate.

131. Defendants violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/report, and by also failing to report accurate information when Defendants knew or should have known the information Defendants are reporting is inaccurate, and/or otherwise contradicted by information known by Defendants, reported to Defendants, and/or reasonably available to Defendants.

132. Defendants' violations of 15 U.S.C. §1681e(b) were willful.

133. Alternatively, Defendants' violations of 15 U.S.C. §1681e(b) were negligent.

134. Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

135. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

136. Defendants are a direct and proximate cause of Plaintiff's damages.

137. Defendant Experian is a substantial factor in Plaintiff's damages.

138. Defendant Equifax is a substantial factor in Plaintiff's damages.

139. Defendant Trans Union is a substantial factor in Plaintiff's damages.

140.    Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. §1681 *et seq.*

## COUNT II
### BMO Harris N.A.
### (Violations of the FDCPA, 15 U.S.C. § 1692)

141.    Plaintiff incorporates herein by reference paragraphs one (1) through ninety-eight (98) of this complaint as though fully set forth herein at length.

142.    Defendant BMO violated the FDCPA. Defendant's violations include, but are not limited to, the following:

143.    Defendant violated the FDCPA by collecting or attempting to collect a consumer debt without complying with the provisions of Sections 1692b to 1692j, inclusive, of Title 15 of the United States Code (Fair Debt Collection Practices Act).

144.    Defendant violated 15 U.S.C. § 1692e(2) by using false, deceptive, or misleading representations or means in connection with the collection of any debt, including the character, amount, or legal status of any debt.

145.    Defendant violated 15 U.S.C. § 1692e(8) communicating or threatening to communicate to any person credit information which is known or which should be known to be false; Defendant BMO knowingly reported false credit information to the CRA Defendants.

146.    Defendant violated 15 U.S.C. § 1692f, by using unfair or unconscionable means to collect or attempt to collect any debt. Specifically, the collection of any amount unless such amount is expressly authorized by the agreement creating the debt or

permitted by law; here Defendant communicated via debt collection letter and Plaintiff's credit reports that Plaintiff was personally liable for $50,000 to $60,000 of debt he did not actually owe.

147. Defendant's acts, as described above, were done knowingly and willfully.

148. As a result of the foregoing violations of the FDCPA, Defendant is liable to Plaintiff for declaratory judgment that Defendant's conduct violated the FDCPA, actual damages, statutory damages, and attorney's fees and costs.

## PRAYER OF RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

a) Declaratory judgment that CRA Defendants violated the FCRA, 15 U.S.C. §1681e(b);

b) An award of actual damages pursuant to 15 U.S.C. §§1681n(a)(1) or 1681o(a)(1);

c) An award of statutory damages pursuant to 15 U.S.C. §§1681n(a)(1) and 1681o(a)(1);

d) An award of punitive damages, as allowed by Court pursuant to 15 U.S.C. §1681n(a)(2);

e) Costs and reasonable attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and §1681o(a)(2); and

f) Declaratory judgment that Defendant BMO violated the FDCPA;

g) Actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

h) Statutory damages of $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2);

i) Costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3)

j) ~~Such other and further relief as this Honorable Court may deem just and proper,~~ including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## VERIFICATION OF PLAINTIFF

I, <u>Gregory Matura</u>, declare as follows:

1. I am a Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of <u>Illinois</u>.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint and, if called on to testify, I would competently testify as to the matters stated herein.

3. Pursuant to 28 U.S. Code §1746, I verify under penalty of perjury under the laws of the United Stated of America that the Factual allegations/statements in this Complaint concerning myself, my activities, and my intentions are true and correct, to the best of my knowledge and recollection.

Executed on _23 Apr 21_

_____
Gregory Matura

24

RESPECTFULLY SUBMITTED,

DATED: April 23, 2021

*/s/Dawn M. McCraw*
Dawn M. McCraw (AZ #035321)
PRICE LAW GROUP, APC
8245 N 85th Way
Scottsdale, AZ 85258
T: (818) 600-5585
F: (818) 600-5485
E: dawn@pricelawgroup.com
*Attorney for Plaintiff*
*Gregory Matura*

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter.

*/s/Jacey Gutierrez*